UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
GREGORY DISTEFANO,
                                                            :
                 Plaintiff,                                        OPINION & ORDER
                                                            :
        -against-                                                  18 Civ. 721 (GWG)
                                                            :
NANCY A. BERRYHILL, Acting Commissioner
of Social Security,                                         :
                                                            :
                 Defendant.                                 :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Gregory Distefano brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Acting Commissioner of Social Security (the

"Commissioner") denying his claim for disability benefits and Supplemental Security Income

under the Social Security Act (the "Act"). Both Distefano and the Commissioner have moved

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For the

reasons stated below, the Commissioner's motion is granted and Distefano's motion is denied.

I. <u>BACKGROUND</u>

        A. <u>Procedural History</u>

        Distefano filed applications for a period of disability and disability insurance benefits

("DIB") and Supplemental Security Income ("SSI") on August 12, 2014, alleging a disability

onset date of October 2, 2008. <u>See</u> Certified Administrative Record, filed May 9, 2018 (Docket

---

        [1] <u>See</u> Notice of Motion for Judgment on the Pleadings, filed Aug. 8, 2018 (Docket # 15);
Plaintiff's Memorandum of Law in Support of his Motion for Judgment on the Pleadings, filed
Aug. 8, 2018 (Docket # 16) ("Pl. Mem."); Notice of Motion, filed Feb. 11, 2019 (Docket # 28);
Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings
and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Feb. 11, 2019
(Docket # 29) ("Def. Mem.").

# 11) ("R."), at 198-99, 260-72.  The Social Security Administration ("SSA") denied Distefano's applications on November 4, 2014.  R. 201-07.  Distefano then requested a hearing before an administrative law judge ("ALJ") to review the denial.  R. 210-11.  Distefano was represented by his attorney at a hearing before an ALJ, which occurred on December 2, 2016.  R. 49-134.  In a decision dated January 11, 2017, the ALJ found that Distefano was not disabled within the meaning of the Act.  R. 24-42.  Distefano requested that the Appeals Council review the ALJ's decision, R. 15-16, and on November 24, 2017, the Appeals Council denied Distefano's request for review of the ALJ's decision, R. 1-4.  That made the ALJ's decision the final decision of the Commissioner.  This action followed.  See Complaint, filed Jan. 26, 2018 (Docket # 1).

## B.  The Hearing Before the ALJ

Distefano's hearing before ALJ Robert Gonzalez occurred on December 2, 2016, in White Plains, New York.  R. 49.  At the hearing, Distefano gave testimony and was represented by his attorney, William Chellis.  R. 49, 200.  Also present and testifying were Distefano's mother, and a vocational expert, Esperanza DiStefano, who was not related to the claimant. R. 49, 120, 417-18.  Before testimony was taken, the ALJ granted Distefano's application to amend the disability onset date to January 26, 2012.  R. 54-55.

### 1.  Distefano

Distefano testified that he was 41 years old and had received a bachelor's degree from Middle Tennessee State University ("MTSU"), where he majored in "recording industry," which means "music production, sound engineering, and music business."  R. 56-57.  He is 5 feet 7.5 inches tall and weighs around 350 pounds.  R. 61.  While a student at MTSU, Distefano did not have any accommodations "for testing, or for schooling, or for note taking."  R. 68.  He graduated with a GPA of 2.9998.  R. 68.  Distefano was living with his mother at the time of the

hearing.  R. 68-69.

Distefano testified regarding his then-current part-time employment.  He had been working as a union stagehand at an outdoor performing arts center in Bethel, New York ("Bethel Woods").  R. 57-58, 59.  The work is seasonal, as the venue is only open from May/June to September.  R. 58.  He had worked that past summer.  R. 62.  As a stagehand at Bethel Woods, Distefano works as part of a crew assisting in setting up microphone stands, plugging in microphone cables, assisting with parts of concert production, putting up speakers, assembling video walls, hooking up cables to amplifier racks, and helping run cables.  R. 59.  He does not, however, "do any rigging," and he is never "on any ladders."  R. 59, 60.  The work generally consists of five hours of setting up and four hours of dismantling and packing up the equipment.  R. 60.  There are certain, more senior, union positions that Distefano cannot perform because of problems with his feet due to diabetes, which causes nerve pain.  R. 61.  This pain is caused "primarily" from Distefano "being on [his] feet," but he can generally carry items, with the help of others, weighing "between 30 to 80" pounds, though Distefano noted this was a "wild estimation."  R. 61.  Additionally, Distefano stated that, during Summer 2016, he only worked "14 out of 27" shows because of his foot pain, diabetes, and the side effects of his blood pressure medication Cinapro, which causes dizziness.  R. 62-63.  He cannot work an event with a "three or four-day run," R. 62, because he cannot work the consecutive days without taking a day off in between, R. 63.

Distefano testified further to his medications and their side effects: he takes "about 14 pills a day."  R. 63.  Besides taking Cinapro for high blood pressure, he also takes Metformin for diabetes, which sometimes causes nausea, and other diabetes medications.  R. 63-64.  Distefano also takes medication for cholesterol, atrial fibrillation, anxiety, and depression.  R. 64.  Dr.

Schild, Distefano's physician, had been prescribing psychotropic medications including Lexapro and Buspar. R. 76. Distefano has anxiety, sometimes resulting in panic attacks. R. 76-77. In addition to taking medication, Distefano deals with his anxiety by trying to calm himself down. R. 77. The only "minute" side effect from these drugs was some weight gain. R. 76. Distefano stated that although his anxiety medication does the "best that it can," he still cannot drive on highways and at night. R. 80. He was hospitalized for pneumonia in San Diego, where he was visiting his brother, and for atrial fibrillation complications in approximately 2011. R. 74-75. The atrial fibrillation complications usually occur after Distefano experiences a head cold or a "bad sinus infection," or allergy complications. R. 75-76.

Distefano has had other part-time jobs. He worked at a ShopRite for a number of weeks in June 2013, but left due to his conflicting work schedule at Bethel Woods, and because the union job at Bethel Woods paid more. R. 73-74, 82-83; see R. 538. Duties at ShopRite consisted of restocking shelves and checking shelves for expired items. R. 74. The shift was "basically midnight to 7:00 a.m." R. 74. Distefano has looked for other work as well. For example, he applied to work at Best Buy and GameStop in the past, and since 2012, Distefano stated that he had applied to "[q]uite a bit" of employers in his search for work — "at least 20." R. 78-79. He had one interview at RadioShack, but believed the interviewer questioned why an individual with a college degree would want to work at RadioShack. R. 79. In other words: "they look at me, and, you know, like I have two heads, like why are you going to take this $8.50 minimum wage job, you know, at your age when you have a Bachelor's Degree." R. 79. Distefano previously worked as a stage manager for a country club around 2007. R. 91-92.

Distefano also testified as to his daily activities and hobbies. He sometimes helps a musician friend out with setting the friend's equipment up, whether it be to record music, or to

play at a local tavern, bar, or "open mike" night. R. 64-66. However, this only happens "once or twice every couple months." R. 65. Distefano himself "dabble[s] with guitar," but is "not very good." R. 67. Distefano drives a car, but only on local roads because of his "very huge anxiety of driving on the highway." R. 67. He testified to driving recently to get breakfast at Dunkin' Donuts, go to the post office, and run errands for his mother. R. 67. Typically, while his mother is away at work, Distefano makes himself breakfast, takes his medication, and does household chores including vacuuming, doing the dishes, taking out the garbage, and doing the laundry. R. 69. He also sometimes shops for his mother. R. 69. During the months when he is not working at Bethel Woods, Distefano plays video games on his Xbox console, uses his computer and laptop, watches videos on YouTube, listens to music, and watches television. R. 77. He has "tried" looking for work, and had been working with the New York State Office for People With Developmental Disabilities ("OPWDD"), an agency which was helping him look for work. R. 77, 87. Distefano does "some" yoga so he is not "housebound so much." R. 77.

As for social relationships, Distefano stated that he has "a couple" friends he socializes with, but it is difficult to see them in part because his mother uses the car to drive to work. R. 69. However, he stated: "there are times . . . when I'm feeling comfortable, and the anxiety isn't at an all-time high, I'm feeling kind of okay, I will go out with my friends and go to a concert, or go out to a movie, or something like that." R. 69-70. In 2014 or 2015, he drove with a friend to Massachusetts to attend a concert, and he sometimes attends the concerts that he helps set up as a stagehand. R. 70-71. He has visited his brother in San Diego by airplane, usually "during the holidays," around six to eight times since 2012. R. 71-72.

Distefano then gave testimony in response to his attorney's questioning. R. 80-91. As to his work at Bethel Woods, Distefano confirmed that he would not be able to "work [a] full shift

continuously for nine hours, or eight hours, or even seven hours." R. 82. As to the panic attacks, he stated that they "come and go whenever," and that the attacks result in "a feeling that comes on that's very overwhelming, and then I start to sweat, my hand sometimes shakes . . . ." R. 83. Vested, a rehabilitation agency, helped Distefano apply for jobs, and although he went on interviews and achieved "excellent" assessment tests, he was "the only one out of all the people they had who wasn't able to get a job." R. 86-87. Distefano expressed that although he "push[ed] through" in college, his anxiety and panic attacks prevent him from working a regular job. R. 87-89. It takes "about an hour at least" for Distefano to "come back to" himself after a panic attack. R. 89. He has some "good days," and some "bad days," which can sometimes last for an entire week. R. 90.

### 2. Ms. Distefano

Ms. Distefano testified that her son has been searching for work, including at WalMart, Staples, Best Buy, and Home Depot. R. 95. She stated that Distefano, as part of his daily activities, washes dishes and towels, and does some laundry. R. 96. His medication side effects, which include dizziness and nausea, have been discussed with his doctors. R. 97. Distefano has "one very good friend that lives close by," R. 98, and enjoys going to concerts, R. 99. She testified that he visits family in California but never alone. R. 100. The ALJ acknowledged that Distefano has "really tried hard by going to [various agencies and] programs in order to try to get placed at a job." R. 103. Despite this, "no one will hire him." R. 103. Ms. Distefano expressed concern that "he keeps coming up as do not hire" due to the amount of times he has applied or how he has answered certain questions on applications or at interviews. R. 103. Ms. Distefano agreed that "he's never gotten a fair shake to get a job to determine what he can or can't do," and that "[h]e just needs an opportunity." R. 104. Ms. Distefano agreed that Distefano "requires a

fairly secure and structured environment to be able to flourish." R. 106. She also discussed how Distefano's grandfather's death affected his life negatively. R. 109-110. Finally, she noted that Distefano has been diagnosed with Asperger's, R. 111, though he never received special accommodations in college, R. 111-12, and expressed sadness that he would be unable to function without her, R. 112-116.

The ALJ reminded Ms. Distefano that his job "is to determine whether or not Gregory can work at any capacity," and that although he sympathized with her and her son, the only question he would be answering was "whether or not he's disabled under Social Security rules and regulations." R. 116-17.

### 3. The Vocational Expert

The VE first testified that Distefano's prior work as a stagehand and stage manager are the same job, "just alternate titles." R. 120. The Dictionary of Occupational Titles ("DOT") categorized the job as a skilled position with heavy exertion. R. 120.

The ALJ then posed a number of hypothetical scenarios to the VE. First, the ALJ asked the VE

> to assume a hypothetical person of the claimant's age, education, and work history. I want you to further assume that the person has the residual functional capacity to engage in a full range of light exertional work as it's defined in the Dictionary of Occupational Titles, except that the person has the following additional limitations. The person cannot work at unprotected heights. The person cannot work on ladders, ropes, or scaffolds. The person must avoid concentrated exposure to dust, fumes, and noxious gases, and the person can occasionally interact with the supervisors, coworkers, and the general public.

R. 120-21. The VE confirmed that such a hypothetical individual could not perform Distefano's past work as a stagehand/stage manager. R. 121. The individual could, however, perform work in the national economy as a "marker," a "router," a "photocopying machine operator," and an "electrical equipment assembler." R. 122. For a second hypothetical, the ALJ asked the VE to

again:

> assume a hypothetical person of the claimant's age, education, and work history. I want you to further assume that the person has a residual functional capacity to engage in a full range of sedentary exertional work as it's defined in the Dictionary of Occupational Titles, except that the person has the following additional limitations. The person cannot work at unprotected heights. The person cannot work on ladders, ropes, or scaffolds. The person must avoid concentrated exposure to dust, fumes, and noxious gases. The person can occasionally interact with supervisors, coworkers, and the general public.

R. 123. The VE again confirmed that such a hypothetical individual could not perform Distefano's past work as a stagehand/stage manager. R. 123. However, the individual could perform work in the national economy as a "document preparer," a "toy stuffer," an "addresser," and a "cutter/paster[,] press clippings." R. 123-24. The ALJ then asked: "If I were to add to both hypotheticals that a person could understand, remember, and carry out simple work, and adapt to routine workplace changes. Would the jobs you returned in hypotheticals one and two still stay?" R. 124. The VE responded that they would. R. 124.

Based on questioning by Distefano's attorney, the VE also testified that if the hypothetical individuals previously described "were to miss more than two days per month" of work, they "would be unable to maintain employment." R. 124-25. If the individuals were "only able to stand for four hours in a day," the VE confirmed that the individuals still "would be able to do those positions." R. 125. The VE confirmed that his testimony was consistent with the DOT except as to his answer regarding days absent from work, which was based on his experience and knowledge. R. 126.

After the VE testified, the ALJ followed up with Distefano regarding a few additional points. As to Distefano's engagement with the organization helping him try to find work, Distefano testified that an individual comes to his house once a week, picks him up, and gets him out of the house, whether it is to have breakfast, or to go exercise at the gym. R. 127-28. At the

8

time of the hearing, Distefano had been working with the organization for about three weeks. R. 128.

C.  The Medical Evidence

The Commissioner and Distefano have both provided summaries of the medical evidence in the record.  See Pl. Mem. at 7-13; Def. Mem. at 3-15.  The summaries are substantially consistent with each other, although the Commissioner's summary is more comprehensive.  In any event, the Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed June 27, 2018 (Docket # 14), ¶ 5, and neither party has done so.  Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

D.  The ALJ's Decision

The ALJ denied Distefano's applications on January 11, 2017.  R. 42.  First, the ALJ found that Distefano met the insured status requirements of the SSA through September 30, 2017.  R. 26.  Then, following the five-step test set forth in the SSA regulations, the ALJ found at step one that Distefano had not engaged in "substantial gainful activity" since January 26, 2012, the alleged onset date.  R. 26; see R. 54.  At step two, the ALJ found that during the relevant period, Distefano suffered from "severe impairments" of "obesity; Asperger's syndrome; autism spectrum disorder; atrial fibrillation; hypertension; sleep apnea; depression; anxiety; asthma; and plantar fasciitis."  R. 27.  At step three, the ALJ found that none of Distefano's severe impairments singly or in combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  R. 27.  In reaching this conclusion, the ALJ gave particular attention to listings 1.02 (major dysfunction of

9

a joint), 3.03 (asthma), 4.05 (recurrent arrhythmias), 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). R. 27-29. As to mental impairments, the ALJ specifically considered whether the "paragraph B" and "paragraph C" criteria were satisfied, and found that they were not.[2] R. 28-29. Before moving to step four, the ALJ addressed Distefano's residual functional capacity ("RFC"). R. 29-40. After consideration of the record, the ALJ found that Distefano had the RFC to perform "light work,"[3] except that Distefano "is restricted from working at unprotected heights or climbing ladders/ropes/scaffolds. He must avoid concentrated exposure to dust, fumes and noxious gases and can only occasionally interact with supervisors, coworkers and the general public." R. 29. In making the RFC determination, the ALJ considered Distefano's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," R. 29-31, the objective medical evidence of record, R. 31-34, and opinion

---

[2] The SSA modified "the criteria in the Listing of Impairments (listings) that [it] use[s] to evaluate claims involving mental disorders in adults and children under titles II and XVI of the Social Security Act (Act)." Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66138 (Sept. 26, 2016). The modifications, however, did not go into effect until January 17, 2017, and the implementing regulations state that the SSA will "apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." Id. Because Distefano applied for benefits in 2014, and had his claim decided on January 11, 2017, the modifications do not apply here.

[3] Pursuant to 20 C.F.R. § 404.1567(b), "light work"

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

evidence in accordance with SSA regulations, R. 34-38. In determining Distefano's RFC, the ALJ accorded varying weights to the opinions of treating and non-treating sources who examined Distefano and/or his medical records, to other medical reports in the record, and to the testimony of Distefano and his mother. R. 34-40. Having determined Distefano's RFC, the ALJ evaluated at step four whether Distefano could continue his past work and concluded that based on Distefano's RFC, he could not. R. 40. At step five, the ALJ concluded — based on Distefano's age, education, work experience, and RFC — that there were jobs that exist in significant numbers in the national economy that Distefano could perform pursuant to 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a). R. 41. For these reasons, the ALJ concluded that Distefano "has not been under a disability, as defined in the Social Security Act, from January 26, 2012, through the date of this decision." R. 42. Accordingly, Distefano was found "not disabled" under sections 216(I) and 223(d) of the Act. R. 42.

II. GOVERNING STANDARDS OF LAW

A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);

Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be upheld,

even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue,

563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.

1990)). The Second Circuit has characterized the substantial evidence standard as "a very

deferential standard of review—even more so than the 'clearly erroneous' standard." Brault v.

Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (citation omitted).

"The substantial evidence standard means once an ALJ finds facts, [a court] can reject those

facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in

original) (citations and internal quotation marks omitted). "The role of the reviewing court is

therefore quite limited and substantial deference is to be afforded the Commissioner's decision."

Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it

is not a reviewing court's function "to determine de novo whether [a claimant] is disabled."

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks

omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Physician" Rule

Under the so-called "treating physician" rule, in general, the ALJ must give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").[4] Treating sources "may bring a unique perspective to the medical evidence that

---

[4] The SSA has subsequently "revised its rules to eliminate the treating physician rule; as a result, ALJs are now to weigh all medical evaluations, regardless of their sources, on the basis of how well supported they are and their consistency with the remainder of the record." Cortese

cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 (citations omitted) ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.").

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which are (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion

---

v. Comm'r of Soc. Sec., 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017); see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); accord Higgins v. Berryhill, 2018 WL 6191042, at *18 n.27 (S.D.N.Y. Nov. 28, 2018). But because the claim here was filed before March 27, 2017, see R. 198-99, the rule applies in this case, see 20 C.F.R. §§ 404.1527, 416.927.

is from a specialist; and (vi) other relevant factors.  See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(2)-(6)).  The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.  However, a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear."  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32).

III.  DISCUSSION

        Distefano raises essentially two grounds for reversing the ALJ's decision.  First, he argues that the ALJ erred at step three in concluding that Distefano did not meet or medically equal a listing.  Pl. Mem. at 13-14.  Second, he argues that the ALJ failed to accord proper weight to the opinions of his treating physicians, and for that reason incorrectly determined his RFC.  Id. at 14-16.  We discuss these arguments next.

        A.  The ALJ's Step Three Analysis

        Distefano first argues that the ALJ erred at step three in determining that Distefano's impairments did not meet or equal listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders).  Pl. Mem. at 13.  He argues that the ALJ's analysis was incomplete because the ALJ primarily based his decision on "the opinion of [state agency consultant] Dr. [J.] Dambrocia," a physician "who did not have the opportunity to examine the

plaintiff[,]" and who "did not have all of the medical evidence in the record when his evaluation was performed." Id. at 14. "If proper weight was given to Dr. Schild or Dr. Meland Lewis," Distefano argues, "at least marked limitations would have been found." Id.

As stated above, at step three in the sequential analysis, the ALJ determines if the claimant suffers from a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet this burden, Distefano must "meet all of the specified medical criteria [in the listing]. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (footnote, citations, and emphasis omitted); see also 20 C.F.R. §§ 404.1525(c)(3), 404.1529(d)(2)-(3); accord Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order); Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs., 360 F. App'x 240, 243 (2d Cir. 2010) (summary order); Wood v. Colvin, 987 F. Supp. 2d 180, 192 (N.D.N.Y. 2013). To show that he meets the criteria, Distefano "must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques." Knight v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012) (citing 20 C.F.R. § 416.926(b)).

Here, the ALJ addressed listings 12.04, 12.06, and 12.08 and considered whether the "paragraph B" criteria were met. R. 27-29. In evaluating the listings, an ALJ must, for each listing, determine whether the "paragraph B" or "paragraph C" are met. For paragraph B, an applicant must meet two of the following criteria:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B) 12.08(B).[5]  Marked "means more than

moderate but less than extreme," or "such as to interfere seriously with [a claimant's] ability to

function independently, appropriately, effectively, and on a sustained basis."  Id. § 12.00(C).

Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs

accompanied by a loss of adaptive functioning," manifested by difficulties with the first three

categories.  Id. § 12.00(C)(4).  For listings 12.04 and 12.06, the paragraph C criteria are also

evaluated.  For listing 12.04, an applicant must show a

> [m]edically documented history of a chronic affective disorder of at least 2 years'
> duration that has caused more than a minimal limitation of ability to do basic
> work activities, with symptoms or signs currently attenuated by medication or
> psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a
> minimal increase in mental demands or change in the environment would be predicted to
> cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive
> living arrangement, with an indication of continued need for such an arrangement.

Id. § 12.04(C).  "The paragraph C criterion of [listing] 12.06 reflects the uniqueness of

agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home," id.

§ 12.00(F), and thus an applicant must show a "complete inability to function independently

outside the area of one's home," id. § 12.06(C).

The Second Circuit has stated that although it has

cautioned that an ALJ "should set forth a sufficient rationale in support of his

---

    [5]  Although the listings have since been revised, we apply the listings that were in effect
at the time the ALJ rendered his decision.  See Revised Medical Criteria for Evaluating Mental
Disorders, 81 Fed. Reg. 66138, 66138 (Sept. 26, 2016); 20 C.F.R. Pt. 404, Subpt. P, App. 1
(effective Sept. 29, 2016 to Jan. 16, 2017).

decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence."

Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (summary order) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)); accord Solis, 692 F. App'x at 48; De La Paz on behalf of S.S.D. v. Comm'r of Soc. Sec., 2018 WL 4179455, at *11 (S.D.N.Y. Aug. 31, 2018); Hairston ex rel. S.N. v. Comm'r of Soc. Sec., 52 F. Supp. 3d 657, 672-73 (S.D.N.Y. 2014); Batista ex rel. M.B. v. Astrue, 2010 WL 3924684, at *7 (E.D.N.Y. Sept. 29, 2010). However, a reviewing court must remand if the ALJ's decision leaves the court "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." Berry, 675 F.2d at 469.

The ALJ's determination at step three that Distefano did not meet or equal listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders) because neither the paragraph B nor paragraph C criteria were satisfied is supported by substantial evidence in the record and is explained in the ALJ's decision. See R. 28-29, 32-40.

First, as to activities of daily living, the ALJ found that Distefano had only "mild restriction." R. 28. This was in large part because he "works on a part-time basis during the summer months, can drive short distances, prepares simple meals, performs household chores, produces music and attends concerts/conventions." R. 28. To be sure, the notes of treating and non-treating sources have indicated that Distefano has some restrictions in his activities of daily living. For example, treating physician and psychiatrist Dr. Linden Schild noted in May 2015 that Distefano's overall medical problems "appear to be exacerbated by his inability to get out of the house and inability to stay active." R. 860. Dr. Schild continued by noting that Distefano

"drives but only to a very limited degree, and he is essentially unable to take public transit."

R. 860.  In March and April 2015, treating physician Dr. Kelli Meland-Lewis diagnosed

Distefano as being on the Autistic Spectrum and indicated that he would be "[s]eriously limited,"

in "[i]nteract[ing] appropriately with the general public" and "[t]ravel[ing] in unfamiliar

place[s]."  R. 689, 685.  A February 2016 form completed by OPWDD indicated that Distefano

"needs assistance or training to perform tasks to be a contributing member of a household."

R. 1409.  However, other evidence reflects that activities of daily living were not so restricted as

the above statements would indicate.  In June 2013, treating physician Dr. Schild noted that

Distefano had started working part time at ShopRite, while also maintaining employment at

Bethel Woods.  R. 538.  Also, Ms. Distefano reportedly noticed improvement in activities of

daily living, for example "showering and getting ready for work."  R. 538.  In August 2013, Dr.

Schild noted that Distefano had been "helpful around the house," and was neatly dressed and

groomed and "in fair spirits."  R. 536.  Similar findings were made by Dr. Schild in November

2013.  R. 534-35.  In March 2014 evaluation notes, Dr. Meland-Lewis indicated that Distefano

was dressed appropriately, and that hygiene "was within normal limits."  R. 560.  Dr. Meland-

Lewis made similar notations after a March 2015 evaluation.  R. 680-81.  Both treating and non-

treating sources indicated Distefano's ability to work on a part-time basis.  See, e.g., R. 875 (Dr.

Schild, June 2016), 688 (Dr. Meland-Lewis, March 2015), 659 (consultative examiner Dr. Greg

Grabon, October 2014), 534 (Dr. Schild, November 2013).  In September 2014, consultative

examiner Dr. Leslie Helprin indicated that Distefano had the ability to prepare food, do the

laundry, go food shopping, manage his own finances, and drive on local roads.  R. 649.  Notably,

Distefano's December 2016 hearing testimony also supports the ALJ's conclusion.  Distefano

testified to being able to drive on local roads, go out for breakfast, go to the post office, and run

errors for his mother. R. 67. While his mother is at work, Distefano makes himself breakfast, takes his medication, does household chores including vacuuming, washing the dishes, taking out the garbage, and doing laundry. R. 69. He indicated minimal side effects from his medications. R. 76. Based on this evidence, the ALJ did not err in concluding that Distefano had only "mild restrictions" in terms of activities of daily living.

Second, in terms of social functioning, the ALJ found that Distefano has "moderate difficulties," as he "suffers from depressive and anxiety symptomatology that would likely worsen with frequent (or more) interaction with others." R. 28. The ALJ also found that Distefano "has demonstrated difficulty interpreting social cues and has some history of irritability," and has "isolative or reclusive tendencies." R. 28. However, as the ALJ noted, Distefano "admitted he enjoyed socializing with others and noted no particular interpersonal difficulties when attending concerts or conventions or working part time." R. 28.

Again, the record contains some evidence of limitations in social functioning. See, e.g., R. 560-61 (Dr. Meland-Lewis's March 2014 observation that Distefano "initially presented as hostile" during an evaluation, and notes of "poor eye contact, looking down or away"), 683 ("Seclusiveness or autistic thinking" in April 2015 notes); see also R. 693 (Dr. Schild opining that Distefano had "[n]o useful ability to function" in regards to "[m]aintain[ing] socially appropriate behavior"), 684 (Dr. Schild opining that Distefano was "[u]nable to meet competitive standards" in regards to "[getting] along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"). But the ALJ's conclusion that only moderate difficulties existed is supported by other record evidence. For example, treating physician Dr. Meland-Lewis's April 2015 evaluation indicated "[l]imited but satisfactory" ability to "[m]aintain socially appropriate behavior." R. 685. In October 2014, Dr. Grabon

21

reported that Distefano enjoys going to concerts and socializing with friends. R. 660. More significantly, the record reveals numerous examples from 2013 to 2016, by treating and non-treating sources, indicating Distefano's ability to work with others in a part-time employment setting, see, e.g., R. 875, 688, 659, 534, and attend social events with others, see, e.g., R. 864 (going to concerts), 660 (going to concerts and movies), 649 (going to concerts and traveling to visit his sibling in other states), 562 ("hanging out with his friends and going to concerts"). Distefano's own testimony tends to support the physicians' notes. See, e.g., R. 61 (discussing his job at Bethel Woods in terms of working with others: "but, you know, anything heavy that we carry is always more than a one-man job"), 70 (When "I'm feeling kind of okay, I will go out with my friends and go to a concert, or go out to a movie, or something like that."). Distefano even testified that he sometimes helps his musician friend set up the friend's equipment, whether it be to record music, or to play at a local tavern, bar, or "open mike" night. R. 64-66. The ALJ could rely on this substantial evidence to conclude that Distefano's ability to function socially is only "moderately" restricted.

Third, the ALJ determined that Distefano had only "mild difficulties" in terms of concentration, persistence, or pace. R. 28. This was because "[c]ognitive testing in the record revealed, at most, mild memory problems/forgetfulness with no significant attention/concentration issues," which was "consistent with the claimant's daily activities, such as his ability to drive a car, play video games (which require considerable concentration and attention to detail) and play a guitar." R. 28. While there is some evidence in the record indicating some limitations in Distefano's cognitive abilities, see, e.g., R. 1020 (treating physician Dr. Syed Jafri's March 2015 note of "memory impairment"), there was significant evidence that Distefano's ability in terms of concentration, persistence, and pace was largely

intact.  Normal cognitive functioning was found in May 2013.  R. 540-41 (Dr. Schild's evaluation notes indicating "normal" psychomotor activity and speech, as well as "goal directed" and "logical" thought process, and "fair to good" judgment and insight).  Indeed, treating and non-treating physician notes ranging from 2011 to 2014 indicate either "normal" intelligence, R. 1157 ("Grossly normal intellect," in April 2011), or "average" intelligence, R. 649 ("Intellectual skills estimated in the average range," in September 2014); see R. 659 ("[Distefano] is very intelligent," though "he occasionally freezes if he is in certain wrong environments," in October 2014).  Treating physician Dr. Meland-Lewis indicated that there was no "low IQ or reduced intellectual functioning" in April and May 2015.  R. 685, 693.  Treating physician Dr. Schild made similar findings in April 2015 and October 2016.  R. 160, 167.  In terms of memory, physician notes dating from 2007 reveal either "normal" memory, R. 515 (August 2012), 914 (September 2012), 1275 (June 2015), 1263 (February 2016), or "intact" memory, R. 574 (November 2007), 588 (September 2009), 900 (September 2012), 1194 (November 2013).  On one occasion in March 2015, Dr. Jafri noted normal memory and that a psychiatric examination revealed that Distefano was "[o]riented to time, place, person [and] situation," with "[a]ppropriate mood and affect."  R. 1020.  Memory impairment was not noted as one of Distefano's "signs and symptoms" in medical source statements from Dr. Meland-Lewis in April 2015 and October 2016.  R. 165, 158.  In September 2014, consultative examiner Dr. Helprin noted that recent and remote memory skills were only mildly impaired.  R. 649.  Critically, Distefano's acknowledged ability to engage in activities such as driving on local roads, R. 67, playing video games and watching videos on YouTube, R. 77, and playing guitar, R. 67, suggests that he has the ability to maintain concentration, persistence, and pace.  For these reasons, we find that the ALJ did not err in his determination.

Finally, the ALJ could properly find that Distefano had not experienced any episodes of decompensation of extended duration. R. 28. As stated above, SSA regulations define episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). These episodes "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)," and "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations . . . ); or other relevant information in the record about the existence, severity, and duration of the episode." Id. Distefano does not argue that any such episodes occurred and we do not see documentation of any in the record.[6]

As to Distefano's claim that "at least marked limitations would have been found" had "proper weight [been] given to Dr. Schild or Dr. Meland Lewis," Pl. Mem. at 14, we disagree. Distefano does not point to specific opinions or observations of Drs. Schild and Meland-Lewis that he believes should have been accorded more weight. But even considering Dr. Schild's opinion that Distefano had "[n]o useful ability to function" in regards to "[m]aintain[ing] socially appropriate behavior," R. 693, or Dr. Meland-Lewis's view that Distefano was "[s]eriously limited" with respect to interacting appropriately with the public, maintaining regular attendance, and working in coordination with or proximity to others without being unduly distracted, R. 684-85, the ALJ was entitled to weigh their opinions against the entire

---

[6] Distefano does not argue the ALJ erred in evaluating the paragraph C criteria for listings 12.04 and 12.06. See Pl. Mem. at 13-14.

record and accord their opinions little weight.  See Veino, 312 F.3d at 588 (the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record").

Distefano argues that the ALJ improperly relied "primarily" on state agency examiner Dr. Dambrocia's opinion in determining that Distefano's symptoms did not establish the presence of the paragraph B or C criteria.  Pl. Mem. at 13-14; see R. 191.  But the ALJ specifically stated that the latter section of his decision regarding Distefano's RFC "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  R. 29.  In other words, the remainder of the ALJ's decision explicates his findings as to the lack of showing as to the paragraph B criteria.

In any event, the ALJ could properly assign great weight to the opinion of Dr. Dambrocia for the reasons already stated and that are discussed further in the next section discussing Distefano's RFC.  See, e.g., Bryant v. Berryhill, 2018 WL 1911276, at *4 (W.D.N.Y. Apr. 23, 2018) (quoting Barber v. Comm'r of Soc. Sec., 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) ("'[i]t is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence'"); see also Kane v. Comm'r of Soc. Sec., 2017 WL 2533410, at *6 (N.D.N.Y. June 9, 2017) ("Per the Regulations, State agency medical consultants are 'highly qualified' individuals 'who are also experts in Social Security disability evaluation.'  20 C.F.R. § 404.1527(e)(2)(i).  Insofar as such opinions are supported by the medical evidence, they may override a treating source's opinion.").[7]  Thus, we conclude that there is substantial evidence in the record that Distefano did

---

[7]   Distefano argues remand is necessary because Dr. Dambrocia "did not have all of the medical evidence in the record when his evaluation was performed," Pl. Mem. at 14 — apparently referring to the fact that Dr. Dambrocia's opinion was rendered in October 2014,

not meet the criteria of listings 12.04, 12.06, and 12.08.

Distefano argues that the ALJ erred because he did not consider listing 12.10 for Autism Spectrum Disorder. Pl. Mem. at 13. Thus, he claims, the ALJ's conclusion of whether Distefano met a listing is incomplete, as "the ALJ did not even evaluate the appropriate listings." Id. at 14. In fact, the ALJ explicitly stated that, after review of the record, he found there was no impairment (singly or in combination with one another) that met or medically equaled "the severity of one of the listed impairments." R. 27. In any event, "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" Salmini, 371 F. App'x at 112 (quoting Berry, 675 F.2d at 469). Here, the paragraph B criteria for listing 12.10 are identical to the paragraph B criteria for those listings 12.04, 12.06, and 12.08. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B), 12.08(B), 12.10(B) (effective Sept. 29, 2016 to Jan. 16, 2017). Because the ALJ found that Distefano did not meet the paragraph B criteria for listings 12.04, 12.06, and 12.08, it is obvious that he found that Distefano did not meet the paragraph B criteria for listing 12.10.

Distefano also argues that the ALJ erred because "nowhere in [his] analysis did he consider Listing . . . 12.11 for a neurodevelopmental disorder." Pl. Mem. at 13. This argument fails for the simple reason that listing 12.11 was not in effect when the ALJ rendered his decision. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (effective Sept. 29, 2016 to Jan. 16, 2017) (describing listings 12.02 through 12.10); see also Lowry v. Astrue, 474 F. App'x 801,

_____

R. 197, and there were other treatments or opinions rendered after that date. Distefano, however, points to no material changes in his condition after October 2014.

804 n.2 (2d Cir. 2012) (summary order) ("[W]e apply and reference the version of [the SSA regulation] in effect when the ALJ adjudicated [claimant]'s disability claim."); Naulty v. Berryhill, 2018 WL 1323150, at *9 n.12 (M.D. Pa. Jan. 9, 2018) (declining to apply a listing because "it did not exist at the time of [plaintiff]'s hearing"); Demler v. Berryhill, 2017 WL 1176050, at *5 n.2 (W.D.N.Y. Mar. 30, 2017) (citing Lowry v. Astrue, 474 F. App'x. 801, 805 n.2 (2d Cir. 2012)) ("in reviewing the Commissioner's decision, the Court applies the listing as it existed when that decision became final").

Finally, Distefano argues that the Court, "[a]t a minimum," should direct the ALJ "to enlist the help of a Medical Expert, a common practice, to help determine whether the plaintiff's condition is of the severity to meet or equal any of the Listings in 12.00." Pl. Mem. at 14. This argument fails as well. To start, it is within the ALJ's discretion to obtain the opinion of a medical expert in order to determine whether a claimant's impairments meet or equal a particular listing. See 20 C.F.R. § 404.1527(e)(2)(iii) (effective Aug. 24, 2012 to Mar. 26, 2017) (emphasis supplied) (an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) and on whether [a claimant's] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart"); Social Security Administration, Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-5-34(A)(2), 1994 WL 637370 (last updated Apr. 1, 2016); accord Urbanak v. Berryhill, 2018 WL 3750513, at *22-23 (S.D.N.Y. July 18, 2018) (citing cases); Velez v. Colvin, 2015 WL 8491485, at *10 n.168 (S.D.N.Y. Dec. 9, 2015). It is true that the ALJ has an obligation to develop the record. See Shaw, 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings . . . .") (citing Schaal, 134 F.3d at 505, and Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir.

1982)); see also Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits") (citing Richardson, 402 U.S. at 400–01). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,'" as was true here, "the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).

### B. The ALJ's Failure to Evaluate Treating Sources

Distefano argues that the ALJ failed to properly evaluate the opinion evidence of record necessary to make a proper RFC determination. Pl. Mem. at 14-16. This is because, according to Distefano, the ALJ should have given more than "little weight to the opinion[s] of Dr. Schild" as provided in two medical sources statements from May 2015 and October 2016. Id. at 14-15. Dr. Schild's opinions, he argues, are "supported by his own office notes and other evidence in the record." Id. at 16. Distefano further argues that the "ALJ's decision improperly does not give significant weight to [the opinions of] Dr. Jafri, Dr. Barbanel, Dr. Nelson and Dr. Hulse" that Distefano "would likely be off task 20% of the work day and absent anywhere from 2 to 4 days per month." Id. at 15. We address these issues in turn.

A claimant's RFC is "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The SSA has stated that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be

expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. at *1; accord Ferraris v. Heckler, 728 F.2d 582, 585 (2d Cir. 1984) (citations omitted) ("[I]n making any determination as to a claimant's disability, the Secretary must explain what physical functions the claimant is capable of performing."). In determining a claimant's RFC, an ALJ weighs the opinions of physicians who have treated or examined the claimant along with other evidence in the record. As previously discussed in Section II, a treating source's opinion, like that of Dr. Schild, is given controlling weight if the opinion is well supported by objective medical and clinical evidence in the record. If the opinion is inconsistent with other substantial evidence in the record, however, the opinion need not be given controlling weight. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)); accord Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). Additionally, an ALJ need not defer to a treating source's opinion on the ultimate issue of disability. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("the ultimate finding of whether a claimant is disabled and cannot work" is to be made by the ALJ, and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative"); accord Tracynger v. Comm'r of Soc. Sec., 269 F. Supp. 3d 106, 119 (S.D.N.Y. 2017) (citing cases). Here, ALJ followed the treating physician rule and properly evaluated the opinion evidence in the record and thus did not err in according less than "significant weight" to the opinions of Distefano's treating physicians. R. 34, 35-38.

Certainly, Dr. Schild, with whom Distefano has been treating since 2013 after a four-year gap in treatment, R. 540, opined on numerous occasions that Distefano was either partially disabled, or totally disabled and not capable of gainful employment. See R. 534 (partially disabled in November 2013), 860 (unable to work due to developmental disability in May 2015),

157 ("Patient has improved over the years, but continues to be disabled from gainful employment due to chronic and persistent mental illness (depression, panic, anxiety, agoraphobia)" in October 2016). In medical source statements from May 2015 and October 2016, Dr. Schild opined that Distefano's mental abilities were either seriously limited, unable to meet competitive standards, or represented no useful ability to function. These abilities ranged from working in coordination and proximity to others without being distracted and sustaining an ordinary routine without special supervision, to setting realistic goals and maintaining socially appropriate behavior. See R. 159-60, 692-93. As to the opinions that Distefano was disabled, ALJ assigned little weight to these opinions because they were "vague, conclusory, on an issue reserved to the Commissioner, fail to set forth a function-by-function analysis of the claimant's abilities and difficulties and are inconsistent with the claimant's daily activities, the doctor's own treatment notes . . . , his part-time work activity, recreational activities and the State agency expert opinion evidence." R. 34.

The ALJ could properly decide to accord "little weight" to Dr. Schild's opinions because they were inconsistent with the record as a whole. To begin, the opinions as stated in Dr. Schild's May 2015 Medical Source Statement are contradicted by notes from treating and non-treating sources, as well as Distefano's own testimony, as described in section III.A above. For example, Dr. Schild identified as symptoms: "pervasive loss of interest in almost all activities," trouble thinking or concentrating, and emotional withdrawal and isolation. R. 691. However, these purported limitations are contradicted by the record evidence. It is apparent from treating and non-treating physician notes that Distefano has continued to engage in and enjoy social activities and has not been completely emotionally withdrawn or isolated. See, e.g., R. 864 (going to concerts, in September 2015), 660 (going to concerts and movies, in October 2014),

30

649 (going to concerts and traveling to visit his sibling in other states, in September 2014), 562

("hanging out with his friends and going to concerts," in March 2014). Further contradicting Dr.

Schild's opinions is the fact that Distefano testified at his December 2016 hearing that he

performs part-time work at Bethel Woods, R. 57-58, plays video games, watches YouTube

videos, listens to music, watches television, R. 77, and plays guitar, R. 67. Moreover, in October

2016, just two months prior to the hearing before the ALJ, while opining that Distefano

remained "partially disabled from gainful employment," Dr. Schild noted that Distefano

tolerated his medication well, denied side effects, and also noted: "Mother confirms [patient] is

doing fairly well overall." R. 879. Similar findings were made in August and March 2016. R.

877 (noting that Distefano was "considering move to S[an] Diego," and that his mother

"confirms [he] is doing well"), 873 ("Tries to get out of the house and spend time with friends

over the winter."); see also R. 862 (noting Distefano "[c]ontinues to benefit from medication"

and has been "good, calm" at home, in June 2015), 864 (noting Distefano was "[h]oping to visit

[his] brother in San Diego for Xmas, or preferably sooner," and that he "tries to keep busy, [and

for example] has a concert to go to tomorrow," in September 2015), 866 ("[Patient's] mother

confirms [patient is] doing well overall," in December 2015). Dr. Schild's comments throughout

2015 and 2016 came after an 18-month period in which Distefano sought no treatment at all.

See R. 860. There is significant additional evidence in the record suggesting that Dr. Schild's

opinions overstated the extent of Distefano's limitations as to his ability to work and function on

a daily basis with moderate limitations, such as Distefano's own testimony that he was

performing part time work, R. 57-58, engaging in social activities, R. 69-71, and actively

seeking employment, R. 86-87. Thus, the ALJ could conclude that Dr. Schild's opinions

regarding Distefano's abilities concerning memory, concentration, maintaining a routine work

schedule, following instructions, and maintaining socially appropriate behavior, R. 692-93, were belied by the record evidence, see R. 37-38, including by the notes of treating and non-treating sources, and Distefano's own testimony regarding the scope of his activities.

The ALJ could properly discount or accord little weight to Dr. Schlid's opinions that Distefano was "disabled." Snell, 177 F.3d at 133 (citing 20 C.F.R. § 404.1527); see, e.g., Wright v. Berryhill, 687 F. App'x 45, 48 (2d Cir. 2017) (summary order). This is because SSA "regulations specify that the ultimate conclusion of whether an individual is 'disabled' or 'unable to work' is reserved to the Commissioner and conclusory opinions by others are entitled to no particular weight." Nunez v. Astrue, 2013 WL 3753421, at *11 (S.D.N.Y. July 17, 2013) (citations omitted).

Distefano also argues that the ALJ improperly and inconsistently weighed the opinions of Dr. Meland-Lewis, a treating physician who, like Dr. Schild, found "serious" limitations in Distefano's ability to maintain a regular schedule, work in close proximity to and with others, follow directions, and interact with the public. Pl. Mem. at 15; see R. 684-85. Dr. Meland-Lewis also found Distefano to exhibit "difficulty with social cues," and a "low tolerance" to frustration, stress, and unexpected changes in environment. R. 685. The ALJ could properly assign "very little weight" to these opinions, as they are inconsistent with the record, as already discussed above. Specifically, we agree that Dr. Meland-Lewis's "findings that [Distefano] effectively could not work with others, detect social cues, cope with stress or deal with work changes [are] inconsistent with [Distefano's] successful, steady part-time work activity and broad range of daily activities," R. 37, which include working part-time as a stagehand, going to concerts with friends, and going to movies. These activities were not only detailed by the state agency consultant and mental consultative examiner, but were confirmed by notes of Distefano's

own treating physician, Dr. Schild, and by Distefano himself at his December 2016 hearing. And of course mental consultative examiner Dr. Helprin has opined that Distefano had "no limitations in his ability to . . . maintain a regular schedule given something to do on a regular basis." R. 650. State agency examiner Dr. Dambrocia found similarly in October 2014. R. 193-94. Notably, the opinions of Drs. Helprin and Dambrocia are supported by at least one note from treating physician Dr. Meland-Lewis in April 2015. See R. 684 (the ability to "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms" was limited but "satisfactory"),

To the extent Distefano argues the ALJ erred as to Dr. Meland-Lewis simply by according more weight to a state agency consultant, see Pl. Mem. at 15, it is well-established that "[s]tate agency physicians are qualified as experts in the evaluation of medical issues in disability claims," and as such, "their opinions may constitute substantial evidence if they are consistent with the record as a whole." Leach ex rel. Murray v. Barnhart, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) (citing Mongeur, 722 F.2d at 1039); accord Blanchard v. Berryhill, 2019 WL 859266, at *5 (D. Conn. Feb. 22, 2019); Ortiz v. Comm'r of Soc. Sec., 309 F. Supp. 3d 189, 205 (S.D.N.Y. 2018); Simmons v. Colvin, 2016 WL 1255725, at *15 (E.D.N.Y. Mar. 28, 2016). Here, the opinions of state agency examiner Dr. Dambrocia, and consultative examiner Dr. Helprin, that Distefano's limitations were not as restrictive as Dr. Meland-Lewis indicated, see R. 34-35, are consistent with the record as a whole, especially considering Distefano's own testimony regarding the extent of his daily activities and part-time work. To the extent Distefano argues the opinions of Dr. Meland-Lewis should be given greater weight because her "findings that the plaintiff has problems with social cues and working with others is not inconsistent with the plaintiff's part time work," Pl. Mem. at 15, that argument fails. The fact that Dr. Meland-

Lewis's opinions are "not inconsistent" with Distefano's ability to work part-time as a stagehand does not mean that the ALJ erred in according those opinions little weight due to substantial contradictory evidence in the record.

Distefano contends that the ALJ improperly did not accord significant weight to the opinions of "[m]ultiple doctors[, Jafri, Barbanel, Nelson, and Hulse,] [who] indicate the plaintiff would likely be off task 20% of the work day and absent anywhere from 2 to 4 days per month." Pl. Mem. at 15; see R. 667 (Dr. Hulse, absent "[a]bout two days per month"), 670-71 (Dr. Barbanel, "off task" for 20%, and absent "[m]ore than four days per month"), 679 (Dr. Jafri, "off task" for 20%, and absent "[m]ore than four days per month"), 699 (Dr. Nelson, absent "[a]bout two days per month"). These doctors primarily addressed physical, not mental, limitations — such as asthma, atrial fibrillation, and sleep apnea — and Distefano gives no indication of why these opinions on physical limitations are supported by the doctors' treatment notes, let alone other evidence in the record. The ALJ could properly assign little or very little weight to these opinions because of the absence of any indication that Distefano could not perform light work on a regular basis. See R. 35-36, 38. In fact, Distefano testified that he worked at ShopRite for seven-hour shifts for a number of weeks because the work was not as "physical" as his concert work. R. 83.

Additionally, the opinions referenced above are contradicted by the notes and opinions of non-treating physicians such as physical consultative examiner Dr. Grabon's medical source statement that Distefano need only avoid respiratory irritants and heavy exertion. R. 662. An ALJ may decide to accord more weight to the opinions of non-treating physicians if their opinions are consistent with the record, as is the case here. See Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating

sources' opinions provided they are supported by evidence in the record."); accord Suttles v.

Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (no error by ALJ to give great

weight to consultative examiner's opinion because it was consistent with record evidence).

Distefano argues that "plaintiff's past history of only working part time work supports

the limitations of being absent from work 2 to 4 times a month and off task 20% of the work

day." Pl. Mem. at 15. But the ALJ found that Distefano was unable to perform his past work as

a stagehand, R. 40, and was instead able to perform light work with certain limitations, R. 29.

Thus, the ALJ accepted that Distefano would be unable to perform full-time work as a

stagehand, specifically considering the inability to work more than two days in a row due to the

heavy physical exertion involved. R. 40; see R. 61, 63. It does not follow, however, that those

same limitations would apply to the performance of light work.

Distefano makes several additional arguments. He argues that the ALJ "failed to analyze

the opinion of Dr. Schild," and "ignored the fact that Dr. Schild has seen the plaintiff for years

and is a psychiatric expert." Pl. Mem. at 15, 14. In fact, the ALJ noted that Dr. Schild is a

psychiatrist, explicitly commented on the fact that Dr. Schild had been treating Distefano for

years, and fully considered the opinions of Dr. Schild. See R. 32-34, 37-38. That the ALJ chose

to accord little weight to those opinions does not mean that he "ignored" Dr. Schild's role as a

treating source. Distefano also argues that the ALJ failed to "take in account exhibit 17F, the

May 26, 2015 report," and "d[id] not indicate how much weight he is providing the opinion[s]"

set forth in the report. Pl. Mem. at 14-15. But the ALJ discussed Exhibit 17F, including whether

or not it is a "function by function assessment," in his opinion, see R. 37-38, and decided to

accord the opinions as stated in the exhibit "very little weight," R. 38.

At one point, Distefano suggests that the Appeals Council improperly failed to consider

new evidence in the form of Dr. Schild's October 2016 report.  See Pl. Mem. at 8.  That

argument fails, however, for the simple reason that the October 2016 report is identical to the

May 2015 report — it is obviously a photocopy of the earlier handwritten document — with only

the date and signature page changed.  Compare, R. 157-63 with, 690-95.  There is no suggestion

that there were any records generated between May 2015 and October 2016 that entitled the later

report to more weight.  Having already found that the ALJ could properly accord "little weight"

to Dr. Schild's opinions in the May 2015 report, the "application of the correct legal standard

could lead to only one conclusion" with respect to the duplicate report from October 2016.

Schaal, 134 F.3d at 504; see, e.g., Camarata v. Colvin, 2015 WL 4598811, at *16 (N.D.N.Y. July

29, 2015) (citing Havas v. Bowen, 804 F.2d 783, 787 (2d Cir. 1986)) ("Because application of

the treating physician rule would inevitably lead to the same conclusion by the ALJ and the

Appeals Council, there is no need to require agency reconsideration."); see also Zabala v. Astrue,

595 F.3d 402, 410 (2d Cir. 2010) ("The ALJ considered [physician]'s 2001 report, and

[physician]'s 2002 report, which the ALJ overlooked, was largely identical to it.  Because the

report that the ALJ overlooked was not significantly more favorable to Petitioner, we find no

reasonable likelihood that her consideration of the same doctor's 2002 report would have

changed the ALJ's determination that Petitioner was not disabled during the closed period.").

Finally, Distefano argues that the ALJ's RFC determination is flawed because the "ALJ's

hypothetical presented to the Vocational Expert does not accurately represent this plaintiff."  Pl.

Mem. at 16.  This is because, it is argued, Distefano "has greater limitations than as found

based upon the findings by the plaintiff's treating physicians."  Id.  However, we have already

concluded that, based on the record evidence, the ALJ properly weighed the opinions of

Distefano's treating physicians, according several of the opinions little or very little weight.  The

ALJ properly accounted for Distefano's limitations concerning social interactions, limiting him to "occasionally interact with supervisors, coworkers and the general public." R. 29, 40. This assessment is consistent with Distefano's ability to engage in daily activities, including working on a part-time basis. The ALJ's hypothetical to the Vocational Expert also properly limited Distefano from "working at unprotected heights or climbing ladders/ropes/scaffolds," and required that he would "avoid concentrated exposure to dust, fumes and noxious gases" due to "obesity, possible distractibility, mental health symptoms, plantar fasciitis, hypertension, atrial fibrillation and sleep apnea." R. 29, 40. The hypotheticals posed to the VE matched the limitations found and thus were proper.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 28) is granted and Distefano's motion for judgment on the pleadings (Docket # 15) is denied. The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated: New York, New York
      March 27, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge